UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 03-10355-DPW |
| | ) | |
| CARMINE T. D'AMELIO | ) | |

## DEFENDANT'S SENTENCING MEMORANDUM (UNDER SEAL)

Defendant Carmine D'Amelio respectfully submits this memorandum in aid of sentencing.

On January 10, 2005, D'Amelio pleaded guilty to bookmaking and associated offenses of money laundering and tax evasion. The plea agreement set out an adjusted offense level of 13. Since D'Amelio is in CHC II, the range would be 15-21 months. (Probation proposes an alternative range of 27-33 months). In the plea agreement, the defendant reserved the right, in the event that the Supreme Court invalidated the Sentencing Guidelines, to argue for a sentence under an indeterminate sentencing scheme. Plea Agreement at 4.

In the wake of <u>Booker</u>, this court must impose a sentence which is "sufficient but not greater than necessary" to achieve the four purposes of sentencing set forth at 18 U.S.C. § 3553(a)(2). <u>See United States v. Booker</u>, 125 S.Ct. 738 (2005). In the course of fashioning this sentence the Court must consider all the factors enumerated at 18 U.S.C. § 3553(a)(1)-(7). <u>Booker</u>, at 764-65. These factors under § 3553(a) play at least

an equal role in federal sentencing. Otherwise, the guidelines constitute a de facto mandatory scheme and the Sixth Amendment right vindicated in Booker is violated. See, e.g., United States v. Hughes, 396 F.3d 374 (4th Cir. January 24, 2005) (sentencing court must consider relevant factors set forth in § 3553(a), as well as the prescribed guideline range, before imposing a sentence).

Further, under 18 U.S.C. § 3661, "No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."

1.  History and characteristics of the defendant 3553(a)(1).

D'Amelio was raised, and lived his entire life, in East Boston. He met his wife in high school. He was too shy to talk with her until his junior year when a mutual friend arranged their first date, to the junior year high school prom. They were inseparable after that, and married four years later. They have been married for thirty one years, faithful to each other and devoted.

They have three children. Carmine (29) graduated from Dominic Savio High School and Suffolk University, and is now a stock trader at Detwiler, Mitchell, Fenton and Graves, and lives in Revere. Michael (25) graduated from Boston Latin and Babson

College, and works for Bears and Stern as a broker. Danielle (23) graduated from Dominic Savio and Marion Court in Swampscott, and works as a clerk. Both Michael and Danielle live at home with their parents. The family is very close.

For more than twenty years, D'Amelio's wife has suffered from depression, dating from post-partum depression following the birth of their third child. Ms. D'Amelio has been treated over the years at the Massachusetts General Hospital. See letter from Dr. Ronald Schouten, Associate Professor of Psychiatry at Harvard Medical School, filed separately under seal. Over the years, her illness had long been successfully managed with the use of the antidepressant Nardil (a monoamine oxidase (MAO) inhibitor used to treat depression), which worked well. But in late 2002, Pfizer recalled Nardil from the market, www.fda.gov/bbs/topics/enforce/2004/ENF00831.html, and she began to suffer from worsening depression as no suitable alternative medications were available. Even when Nardil returned to the market, the medication no longer seemed to help Ms. D'Amelio.

As set out in the letter of Dr. Schouten, "her illness has become more resistant to medication" and her overall condition "has worsened." She tried to commit suicide twice in 2003, both with by overdose, the second (July 2003) being "nearly fatal" and resulting in her commitment to a psychiatric hospital. Her third attempt was in January 2005, within days of her husband's change

of plea in this Court, and involved an overdose after a failed
attempt to electrocute herself by dropping a television set into
a water-filled bathtub.  She was hospitalized and treated with
electroconvulsive therapy.  According to Dr. Schouten, "she is
being maintained on various medications, but there is a
substantial possibility that she will require another course of
ECT or maintenance ECT."

     Dr. Schouten reports that he is

> "greatly concerned that Mr. D'Amelio's absence from
> the home will result in an increased likelihood of a
> successful suicide attempt by Ms. D'Amelio should she
> have another recurrence of her depression.  The
> likelihood of a recurrence is approximately 90% in
> individuals who have had 3 or more episodes of Major
> Depression."

<u>Id</u>.  In Dr. Schouten's opinion:

> "In order to avoid a repetition of the previous three
> suicide attempts, it is essential that Ms. D'Amelio
> have someone available to her at home who is fully
> aware of the subtle indicators of her symptoms and has
> the interpersonal authority to challenge her denial.
> Ms. D'Amelio's children are not in a position to
> challenge her when she minimizes her symptoms or to
> provide the level of monitoring and intervention she
> requires.  The best protection for Ms. D'Amelio is the
> ongoing presence of her husband to monitor her mood and
> symptoms and to control her access to medication.  He
> has learned a great deal about her illness, its
> symptoms, and their management, and his capacity to
> monitor here, control her medication, and intervene in
> a timely fashion far exceeds that of his children."

<u>Id</u>.

     D'Amelio is utterly devoted to his wife and is grieved that
she is at risk because of his behavior.  He worries that, unless

-4-

he is at home and nearby to encourage her through her depression, she will again try to harm herself. While their children will be attentive to her needs, he is concerned that his wife so relies on him for daily comfort and support, she will be missing a critical support to help her through her depression. It is an enormous burden for him to worry what might become of her.

Defendant has submitted many letters from family, friends and acquaintances that attest to his devotion to his wife and family and his kindness to others.

D'Amelio is in Criminal History Category II. He was arrested on the charges here in December 2003. It is undisputed that D'Amelio had quit bookmaking, on the government's estimate, at least by January 2002. Thus, his arrest came almost two years after he quit, and this Court sentences him now, over three years after he left bookmaking. D'Amelio has been working as a truck driver.

    2.    The need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." (§ 3553(a)(2)(A).

Defendant was charged with conducting an illegal gambling business and with the associated acts of money laundering and tax evasion. The illegal gambling guideline is 12. U.S.S.G.

§ 2E3.1(a)(1). If charged alone, the offense would yield a guideline in the Zone C range, reflecting the judgment of the Sentencing Commission of the modest seriousness of bookmaking, relative to other crimes.

In the conduct of the bookmaking business, D'Amelio did not commit any acts of violence against other people. He was partners with a man and that man's son. Phones of the other man and his son were tapped, with D'Amelio's tapped only at the end of the investigation. Conversations captured on court-authorized intercepts show D'Amelio reporting figures to his partner, and discussing the business with him. It is apparent from the taped conversations that D'Amelio relied on his partner (throughout the period, his closest friend) to make business decisions.

The partner, in turn, was involved in other ventures which D'Amelio was not part of or withdrew from. Among other things, the partner bet with off-shore gambling entities, taking advantage of better lines to hedge his action. The partner discussed these ventures with D'Amelio, indeed discussed moving the business off-shore to operations on a larger scale outside U.S. boundaries. Defendant declined. His was the world of local sports betting, with local customers who were not permitted to bet beyond their means and who were assured prompt payment by D'Amelio.

In this district, prosecution of bookmaking has generally been for an ulterior purpose, to force bookies to cooperate in the prosecution of organized crime figures.  Particularly during the 1992-2000 period, there was an explosion of bookmaking prosecutions in this district, all aimed at securing cooperation of bookmakers against organized crime principals (e.g., Frank Salemme and Whitey Bulger) who exacted "tribute" or "rent" from bookmakers as a principal source of their revenue.[1]

This prosecution is of a kind.  At the time of Mr. D'Amelio's indictment, he was alleged to have been victimized by organized crime demands for rent.  The prosecution where that allegation was raised is now resolved by guilty pleas before Judge Wolf, with one of the defendants already sentenced (to a term of 30 months on a guideline range of 24-30 months).  The other two remain to be sentenced.  See United States v. Frederick Simone et al., Criminal No. 03-10356-MLW.

None of this is offered as absolution of Mr. D'Amelio, only to suggest that bookmaking has rarely been a stand-alone charge meriting federal prosecution unless other more important ends were served.

---

[1]See Lehr and O'Neill, Black Mass, HarperCollins (2000), at 257 ("The plan [of law enforcement officials] was to make cases against bookies that could be handed off to the feds, who could use their tougher sentences to turn bookmakers, accustomed to paying $3,000 fines in state court and never going to jail, into witnesses.")

3. The need for the sentence "to afford adequate deterrence to criminal conduct" (§ 3553(a)(2)(B).

As reflected in the judgment of the Sentencing Commission (which set a flat level 12 for bookmaking), bookmaking is a crime where there is modest need for general deterrence.

4. The need for the sentence "to protect the public from further crimes of the defendant" (§ 3553(a)(2)(C).

Defendant has not engaged in bookmaking for several years. His pretrial release has been uneventful. It is extremely unlikely that he would re-offend. There is no suggestion in the PSR or in the record that he poses any danger to the community.

Prior to Booker, courts had limited authority to reduce a sentence where a defendant had turned away from his past criminal conduct. Thus, in United States v. Sklar, 920 F.2d 107, 116 (1st Cir. 1990), the First Circuit held that "a defendant's rehabilitation might, on rare occasion, serve as a basis for a downward departure, but only when and if the rehabilitation is 'so extraordinary as to suggest its presence to a degree not adequately taken into consideration by the acceptance of responsibility reduction'"). See also United States v. Maier, 975 F.2d 944 (2d Cir. 1992) (departure from 51-63 month range to probation because of extraordinary drug rehabilitation efforts). In the wake of Booker, courts can consider whether there the public needs to be protected from a defendant or, conversely, whether a defendant's renunciation of his past is a factor which

-8-

might mitigate his sentence.  See also United States v. William Davis, Criminal No. 00-10124 (D. Mass. 2001), on a charge of filing false tax return with a range of 24-30 months, this Court sentenced the defendant to a term of 15 months based upon "defendant's life changes."

Further, in view of the fragile health of his wife, there is additional assurance that D'Amelio would not re-offend.

5.    The "kinds of sentences available." (§ 3553(a)(3).

Post-Booker, the Court has greater flexibility to fashion a sentence, including a so-called split sentence which was formerly limited to Zones B and C.  The sentencing zones, as with the rest of the guidelines, are now advisory.

6.    The "kinds of sentence and sentencing range" established under the Guidelines and "any pertinent policy statement"(§ 3553(a)(4) & (5).

Under § 3553(a)(4), the Court must consider the applicable guideline range, including whether a departure from the range is applicable in this case, and if so to what extent, before continuing with its analysis under 18 U.S.C. § 3553(a).  See United States v. Jones, 352 F.Supp.2d 22 (D.Me. January 21, 2005) (Hornby, J.).

The parties submit that the appropriate range is 15-21 months.

A departure is appropriate on the basis of D'Amelio's extraordinary family responsibility to his wife who suffers from

-9-

depression.  Under <u>Pereira</u>, the standard for this departure was
high.  <u>United States v. Pereira</u>, 272 F.3d 76, 82 (1st Cir. 2001);
<u>United States v. Roselli</u>, 366 F.3d 58 (1st Cir. 2004).  However,
post-<u>Booker</u>, a court need not forego imposing a reduced sentence
where a defendant is not the lone caretaker.  In <u>United States v.</u>
<u>Antonakopoulos</u>, 399 F.3d 68 (1st Cir. 2005), the trial court had
denied a downward departure where other persons could be found to
provide interim care, citing <u>Pereira</u>.  As described in the First
Circuit's opinion, "[a]t sentencing the defendant sought a
downward departure based in part on the fact that his son was
brain damaged and he had been his son's caretaker.  The [trial]
court determined that others can also provide care, and indeed
have done so during his imprisonment."  <u>Id</u>.  The <u>Antonakopoulos</u>
court, ruling in the wake of <u>Booker</u>, stated that "[t]his ground,
that of family circumstances, is still open and is not
frivolous."  <u>Id</u>.

    In <u>United States v. Sclamo</u>, 997 F.2d 970 (1st Cir. 1993),
the court departed from offense level and CHC II, to impose a
sentence of probation with 6 months home confinement for
extraordinary family circumstances.  <u>See</u> <u>also</u> <u>United States v.</u>
<u>Caccavaro</u>, No. 00-10166 (D.Mass. August 3, 2001) (Woodlock, J.)
(departure from 24-30 month range to probation with 24 months
home confinement); <u>United States v. Janell Dansby</u>, Criminal
No. 03-10066-DPW ("Unusually significant and demanding family

-10-

responsibilities, U.S.S.G. § 5H1.6, demonstrated and made even more salient during the defendant's commendable and substantial efforts and accomplishment in pre-sentence rehabilitation."); United States v. Sickinger, Criminal No. 95-10062 (D.Mass. March 11, 1996) (Keeton, J.) (departure from 27-33 month range to probation with 12 months home confinement); United States v. Taylor, Criminal No. 96-10337 (D.Mass. June 17, 1999) (Keeton, J.) (departure from 24-30 month range to probation with 6 months home confinement); United States v. Santinello, Criminal No. 97-30007 (D.Mass. June 22, 1999) (Ponsor, J.)(departure from 24-30 month range to probation with 12 months home confinement); United States v. Parry, Criminal No. 01-40020 (D.Mass. October 9, 2001) (Gorton, J.) (departure from 27-33 month range to probation with 6 months community confinement and 9 months home confinement); United States v. Allen, Criminal No. 01-10065 (D.Mass. May 16, 2002) (Stearns, J.) (departure from 21-27 month range to 6 months home confinement as condition of supervised release); United States v. Webb, Criminal No. 02-10024 (D.Mass. January 17, 2003)(Wolf, J.) (departure from 10-16 month range to probation with four months home confinement).

7.    The "need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."(§ 3553(a)(6).

The government's decision to indict for crimes associated with running a gambling business (laundering money and tax

evasion) drove higher guidelines here.  In <u>United States v. Donald Willis</u>, Criminal No. 03-10207-NG, the government charged defendant, who headed a Waltham bookmaking business, with filing false tax returns.  His offense level, for a tax loss between $325,000 and $500,000, was 17 (reduced for acceptance of responsibility).  The decision <u>not</u> to charge money laundering led to a reduced guideline.  In <u>United States v. Richard Johnson</u>, Criminal No. 99-10234-DPW (D.Mass. 2000), the government charged defendant with bookmaking in addition to two money laundering charges (18 U.S.C. §§ 1956 and 1957), but dismissed both money laundering charges to permit defendant to plead to a single count of bookmaking with a base guideline of 12.  (This Court then departed from a range of 10-16 months to a sentence of probation, stating "Departure is warranted pursuant to U.S.S.G. § 5K2.0 due to Defendant's medical problems, which require continuous monitoring, and the necessity of defendant to continue to work to support his family and to pay for health insurance for himself and his wife, who is seriously ill.")

CONCLUSION

On the basis of "extraordinary family obligations," assessed in the light of <u>Booker</u>, and in view of the purposes of sentencing (particularly since defendant has renounced his criminal past), defendant petitions the Court to impose a sentence of time served (defendant having been arrested on the indictment), followed by

-12-

three years of supervised release, the first twelve months of
which are to be served under house arrest.

CARMINE T. D'AMELIO
By his attorney,

Charles P. McGinty
B.B.O. #333480
Federal Defender Office
408 Atlantic Avenue, 3rd Floor
Boston, MA  02110
Tel: 617-223-8061

## CERTIFICATE OF SERVICE

I, Charles P. McGinty, hereby certify that a true copy of
the above document was served on Assistant United States
Attorneys Ernest DiNisco and Heidi Brieger by delivery on
April 1, 2005.

Charles P. McGinty